UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS A. MICHALSKI,<br><br>  Plaintiff,<br><br>  v.<br><br>CAROLYN COLVIN,<br><br>  Defendant. | Case No. 15-cv-04483-EMC<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Docket Nos. 15-16 |

In April 2012, Plaintiff Thomas A. Michalski protectively filed an application for disability insurance benefits under Title II of the Social Security Act. *See* AR 80, 160-61. The application was denied initially in November 2012, *see* AR 91, and then upon reconsideration in March 2013. *See* AR 105. Mr. Michalski then requested a hearing before an administrative law judge ("ALJ"). *See* AR 122. A hearing was held before ALJ Judson Scott on March 7, 2014. *See* AR 24. Subsequently, on March 27, 2014, ALJ Scott issued his decision, concluding that Mr. Michalski was not disabled from April 1, 2011 (the alleged onset date) through the date of his decision. *See* AR 10-19. Mr. Michalski asked that the Appeals Council for the Social Security Administration review the ALJ's decision, but that request was denied, thus leaving the ALJ's decision as "the final decision of the Commissioner of Social Security." AR 1. Mr. Michalski then initiated the instant action, challenging the ALJ's decision.

Mr. Michalski exhausted his administrative remedies with respect to his claim of disability. This Court has jurisdiction to review pursuant to 42 U.S.C. § 405(g). Mr. Michalski has moved for summary judgment, seeking a reversal of the Commissioner's decision and a remand for an immediate award of benefits. The Commissioner has cross-moved for summary judgment. Having considered the parties' briefs and accompanying submissions, including but not limited to

the administrative record, and good cause appearing therefor, the Court hereby **GRANTS** Mr. Michalski's motion for summary judgment and **DENIES** the Commissioner's cross-motion. The case is remanded for further proceedings within the Social Security Administration.

## I.   FACTUAL & PROCEDURAL BCKGROUND

In April 2012, Mr. Michalski protectively filed an application for disability insurance benefits. According to Mr. Michalski, he suffered from bipolar disorder, anxiety, and ADHD, and became unable to work as of April 1, 2011, *see* AR 80, which was shortly before a month-long hospitalization following a manic episode. As noted above, ALJ Scott rejected Mr. Michalski's claim for benefits, applying the five-step sequential evaluation process provided for by 20 C.F.R. § 404.1520.

> "Step one disqualifies claimants who are engaged in substantial gainful activity from being considered disabled under the regulations. Step two disqualifies those claimants who do not have one or more severe impairments that significantly limit their physical or mental ability to conduct basic work activities. Step three automatically labels as disabled those claimants whose impairment or impairments meet the duration requirement and are listed or equal to those listed in a given appendix. Benefits are awarded at step three if claimants are disabled. Step four disqualifies those remaining claimants whose impairments do not prevent them from doing past relevant work. Step five disqualifies those claimants whose impairments do not prevent them from doing other work, but at this last step the burden of proof shifts from the claimant to the government. Claimants not disqualified by step five are eligible for benefits."

*Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003).

In the instant case, ALJ Scott made the following rulings regarding the five steps.

At step one, the ALJ found that Mr. Michalski had not engaged in substantial gainful activity since the alleged onset date of April 1, 2011. *See* AR 12.

At step two, the ALJ concluded that Mr. Michalski had the following severe impairments: "alcohol dependence in recent remission; mood disorder, not otherwise stated; and social anxiety." AR 12. In so concluding, ALJ Scott implicitly rejected Mr. Michalski's claim that that he suffered from bipolar disorder and ADHD.

At step three, the ALJ concluded that Mr. Michalski did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed

impairments in the relevant appendix found in the Social Security Regulations.

At step four, the ALJ determined that Mr. Michalski had the residual functional capacity ("RFC") "to perform a full range of work at all exertional levels" but that he did have certain nonexertional limitations – namely,

> the range of simple repetitive through moderately detailed work; occasional (defined as 30% of the workday) contact with others; low stress work, defined as few changes in the work/setting and no rapid production work; may be off task up to 5%-10% of the workday; and can sustain normal workplace attendance.

AR 14. Based on this RFC, the ALJ held that Mr. Michalski "is capable of performing past relevant work as an estimator," both as actually and generally performed. AR 17.

Given his finding at step four, the ALJ concluded that Mr. Michalski was not disabled for purposes of the Social Security Act. And given this conclusion, the ALJ did not have to address step five; nevertheless, he did so. More specifically, ALJ Scott found that "there are other jobs existing in the national economy that [Mr. Michalski] is also able to perform" given his RFC, age, work experience, and education. AR 17. Those jobs included linen room attendant and shipping and receiving clerk. *See* AR 18. Thus, again, the ALJ concluded that Mr. Michalski was not disabled for purposes of the Social Security Act.

## II.   DISCUSSION

A.   Legal Standard

After a final decision on a claim for benefits by the Commissioner, the claimant may seek judicial review of that decision by a district court. *See* 42 U.S.C. § 405(g). The Commissioner's decision will be disturbed only if the ALJ has committed legal error or if the ALJ's findings are not supported by substantial evidence. *See Stout v. Comm 'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006) ("We will uphold the Commissioner's denial of benefits if the Commissioner applied the correct legal standards and substantial evidence supports the decision."). Substantial evidence is relevant evidence – "more than a scintilla, but less than a preponderance" – that a reasonable mind may accept to support a conclusion. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). A court evaluates "the record as a whole, . . . weighing both the evidence that supports and detracts from the ALJ's conclusion" to determine if substantial evidence supports a

1  finding. *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001). If the evidence supports "more
2  than one rational interpretation," the Court must uphold the ALJ's decision. *Burch v. Barnhart*,
3  400 F.3d 676, 680-81 (9th Cir. 2005).
4        In the instant case, Mr. Michalski makes a number of arguments as to how the ALJ's
5  findings are not supported by substantial evidence. Those arguments fall loosely into three
6  categories: (1) that the ALJ erred in concluding that Mr. Michalski did not suffer from bipolar
7  disorder; (2) that the ALJ erred in partially rejecting Mr. Michalski's credibility; and (3) that the
8  ALJ erred in assessing what work Mr. Michalski could perform based on his RFC.

### B.  Bipolar Disorder

As noted above, at step two of the five-step process, ALJ Scott declined to find that Mr. Michalski suffered from bipolar disorder. In so ruling, ALJ Scott rejected the diagnosis of bipolar disorder rendered by Mr. Michalski's treating physician, Dr. Eaton,[1] and credited instead the opinion of nonexamining physicians, such as Dr. Cohen who testified as the medical expert at the ALJ hearing and the reviewing state agency physician Dr. Solomon. *See* AR 16-17.

In his motion, Mr. Michalski contends that the ALJ erred in rejecting Dr. Eaton's opinion, which affected not only the ALJ's step-two analysis but also, implicitly, his analysis of the remaining steps. The Court agrees.

> Cases in [the Ninth] [C]ircuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians). As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant. . . . [I]f the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for doing so.

*Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Furthermore, "[t]he opinion of a nonexamining physician cannot *by itself* constitute substantial evidence that justifies the rejection

---

[1] Based on the administrative record, it appears that Dr. Eaton treated Mr. Michalski from at least May 2010 through June 2013. Dr. Eaton suspected bipolar disorder as early as May 2010. *See* AR 259.

4

of the opinion of . . . a treating physician." *Id.* at 831 (emphasis added); *see also Hill v. Astrue*, 698 F.3d 1153, 1160 (9th Cir. 2012) (stating the same).

In the instant case, the Court is hard pressed to find any basis for the ALJ's rejection of Dr. Eaton's opinion other than the opinions of two nonexamining physicians, in particular, Dr. Cohen. The ALJ's opinion states: "I have read and give little weight to the opinion of treating psychiatrist Dr. Eaton who concluded that the claimant has marked limitation in social functioning and repeated episodes of decompensation due to anxiety and depression with manic episodes since Dr. Eaton's opinion is based on periods of the claimant's noncompliance with his medication and his continued alcohol abuse." AR 17. The ALJ effectively adopted Dr. Cohen's opinion, who testified:

> It's very unclear if they [*i.e.*, the treating physicians] felt he had a bipolar disorder, and that one of the doctors didn't think he had a bipolar disorder because the episodes only occur when he goes on drinking binges and he's not adherent with medications. It's important to understand that alcohol is contraindicated with bipolar disorders. It's all throughout the psychiatric literature. You don't give people – because it mimics – it causes bipolar manic episodes.
>
> . . . .
>
> [I]t's important to understand there's been – all throughout the records there's non-compliance with his medications. He doesn't follow-up, that's why he's going to the hospital, and he starts to drink with his medications. And when he drinks with his medications it's dangerous and it makes the meds not work. So he needs to – if he takes his medicine, is complaint with treatment, you know, he'll be able to attend work.

AR 51, 57. The ALJ so understood Dr. Cohen's testimony: "Dr. Cohen disagreed with the diagnosis of bipolar disorder provided by Dr. Eaton since the diagnosis was made during claimant's active alcohol abuse, which mimics manic behavior." AR 16. Because the ALJ relied solely on the testimony of nonexamining doctors to reject the treating physician's opinion, that is problematic. *See Lester*, 81 F.3d at 831 (stating that "[t]he opinion of a nonexamining physician cannot *by itself* constitute substantial evidence that justifies the rejection of the opinion of . . . a treating physician") (emphasis added).

Even if the ALJ's reliance on Dr. Cohen and the state agency physician alone were not a problem, the Court concludes that the ALJ failed to provide specific and legitimate reasons

5

1   supported by substantial evidence for rejecting Dr. Eaton's opinion.

2       First, Dr. Eaton was not alone in diagnosing Mr. Michalski with bipolar disorder. Notably,
3   another treating physician (Dr. Gemma Guillermo) – who treated Mr. Michalski for approximately
4   a month during his hospitalization at Sequoia Hospital, following a manic episode that took place
5   in late May 2011 – also diagnosed bipolar disorder. *See* AR 240. A diagnosis of bipolar disorder
6   was also rendered by Mr. Michalski's therapists, Genevieve Walker (MFT trainee) and Steven
7   Dallmann (a MFT and also, apparently, Ms. Walker's supervisor), who had treated him on a
8   weekly basis since October 2011. *See* AR 334 (letter authored by Ms. Walker and reviewed and
9   approved by Mr. Dallmann). The Court acknowledges that the opinions of Ms. Walker and Mr.
10  Dallmann may be afforded less weight, because they are not "acceptable medical sources" under
11  the Social Security regulations. *See Dickey v. Colvin*, No. 2:13-cv-2463-EFB, 2015 U.S. Dist.
12  LEXIS 40965, at *7 (E.D. Cal. Mar. 30, 2015) (noting that "[t]he applicable regulations [*e.g.*, 20
13  C.F.R. 404.1513(e)(1)] provide that a therapist, although a treating medical source, is viewed as an
14  'other source' and not as an 'acceptable medical source'"); *Dale v. Colvin*, 823 F.3d 941, 947 (9th
15  Cir. 2016) (stating that an "ALJ is entitled to give less weight to an 'other source' medical opinion
16  by providing 'reasons germane to each witness for doing so'"). The ALJ's only comment in this
17  regard was: "Ms. Walker is not an acceptable medical source but rather a *Trainee*, Licensed
18  Marriage and Family Therapist. Her opinions are given no weight." AR 17. While Ms. Walker
19  is, as the ALJ pointed out, simply a trainee therapist, *see* AR 17, Mr. Dallmann is not.[2]

20      At bottom though, all of the treating sources have provided a consistent diagnosis of
21  bipolar disorder, the ALJ rejected that diagnosis based entirely on the opinions of physicians who
22  never even examined Mr. Michalski. *See Lilienthal v. Astrue*, No. C09-5185RBL, 2009 U.S. Dist.
23  LEXIS 124389, at *8 (W.D. Wash. Dec. 21, 2009) ("[T]he ALJ rejected plaintiff's alleged bipolar
24  disorder, despite the fact that every diagnosis by an examining source includes a finding of bipolar
25  disorder. Rather than accept the persuasive medical opinion evidence, the ALJ adopts the onetime

---

[2] The Court agrees with the ALJ that the Mental Disorder Questionnaire Form that was submitted by Ms. Walker and Mr. Dallmann, *see* AR 359-63, 373-77, is not readable. *See* AR 17. But if that being the case, it should have been a simple matter for the ALJ to ask the therapists to provide a more legible copy or, if one were not available, to provide the same information in another form.

opinion of a non-examining physician, whose opinion is based solely on a review of the medical records"). The ALJ merely stated: "I afford great weight to the opinion of Dr. Cohen since he reviewed the record in its entirety and heard all of claimant's testimony, and he understands the social security disability program and its evidentiary requirements. Moreover, he has significant experience in treatment and research in addiction disorders. His opinion is reasonable and credible and is supported by the medical evidence of record." AR 16-17. Yet, the medical records of all the treating physicians contained a diagnosis of bipolar disorder.

Second, Dr. Cohen, the nonexamining physician on whom ALJ primarily relied, concluded that Mr. Michalski did not have bipolar disorder for two reasons: (1) because Mr. Michalski's manic episodes occurred only "when he goes on drinking binges" and alcohol abuse "can mimic manic episodes" and (2) because his manic episodes occurred only when he was not medication compliant. AR 51 (testimony of Dr. Cohen at ALJ hearing). But both of those reasons are problematic. As to (2), that is no reason to conclude that Mr. Michalski did not have bipolar disorder; at best, it would suggest that, if Mr. Michalski did have bipolar disorder (or a similar mood disorder), it could be controlled by medications. But notably, Dr. Eaton took note as early as May 2010 (*i.e.*, a year before the manic episode that led to Mr. Michalski's month-long hospitalization) that multiple medications had been tried with little improvement. *See, e.g.*, AR 259. Moreover, Mr. Michalski had been prescribed Zyprexa since at least 2010 to stabilize his mood, but, apparently he was not improving, as he was subsequently prescribed Lithium in March 2014, shortly before the hearing before the ALJ. *See* AR 37-38.

As for Dr. Cohen's statement that Mr. Michalski's manic episodes occurred only when he was abusing alcohol, the record is insufficient to establish that point. The May 2011 manic episode clearly had an alcohol abuse component, but there is nothing concrete in the record before the Court of the other manic episodes or hospitalizations (two of which occurred in 2002 and December 2012).[3]

---

[3] Mr. Michalski argues that the ALJ violated his duty to fully and fairly develop the record by failing to obtain at least the December 2012 medical records regarding his hospitalization. The Court agrees that the ALJ should have made an effort to obtain the December 2012 medical records – as well as the earlier medical records from 2002. "An ALJ's duty to develop the record

7

Moreover, even if Dr. Cohen were correct – *i.e.*, that the manic episodes took place while Mr. Michalski was drinking, *see, e.g.*, AR 230 (SF General Hospital medical record from May 2011) (indicating that the 2002 episode occurred when Mr. Michalski drank and became suicidal); AR 28 (ALJ hearing transcript) (Mr. Michalski testifying about the December 2012 incident and stating that he was intoxicated), and that alcohol abuse can mimic manic episodes – that in and of itself is not to establish that Mr. Michalski's conduct was caused by alcohol consumption only and not, in addition, by a mental impairment. Indeed, Dr. Eaton, in a Drug Addiction and Alcoholism Questionnaire, explained that "Bipolar I D/O frequently has co-occurring alcohol abuse which can exacerbate the condition, but does not cause it." AR 366. The DSM-V contains statements to a similar effect. *See, e.g.*, DSM-V, *available at* http://dsm.psychiatryonline.org (last visited Aug. 30, 2016) (referencing different bipolar disorders, including, *e.g.*, bipolar I disorder and, separately, substance/medication-induced bipolar and related disorder; noting, in addressing bipolar I disorder, that a manic episode may arise during treatment or drug use but "persists beyond the physiological effect of the inducing agent").

The Commissioner contends that, even if the ALJ did err in not crediting Dr. Eaton's diagnosis of bipolar disorder, that error is of no consequence because the formal diagnosis is not what is important; rather, what is important are the functional limitations resulting therefrom and, here, the ALJ did take into account nonexertional limitations that Mr. Michalski had as a result of any mental impairment. While the Commissioner's argument is not without some appeal, the Court is not persuaded. If the ALJ had fully credited Dr. Eaton's diagnosis of bipolar disorder – instead of just finding a mood disorder and social anxiety – it is hard to imagine that the ALJ would not have been more sympathetic to the claimed severe symptoms, as expressed by Mr. Michalski. In other words, ALJ Scott could well have found Mr. Michalski more credible, and affording such credibility could have affected the ALJ's assessment of Mr. Michalski's RFC. *See* Part II.C, *infra* (discussing credibility). If Dr. Eaton's opinion were credited, this likely would

---

further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes*, 276 F.3d at 459-460. To evaluate Mr. Michalski's mental impairment, the ALJ needed to have information about the claimed repeated manic episodes or hospitalizations, including those that took place before the alleged onset date.

have directly impacted the ALJ's assessment of Mr. Michalski's functional limitations. With bipolar disorder, Mr. Michalski could have had major depression or experienced manic episodes requiring hospitalization, *see* DSM-V (noting that, for bipolar I disorder, major depressive episode may precede or follow a manic episode), which could well be in tension with the ALJ's assessed RFC – *e.g.*, that Mr. Michalski would be off task only 5-10% of the workday and could sustain normal workplace attendance. *See* AR 14. Simply put, it is difficult to conclude a diagnosis of bipolar disorder would have been entirely irrelevant.

Accordingly, the Court concludes that the ALJ improperly rejected the opinion of Dr. Eaton and that this error infected not only step two of the five-step process but also the steps thereafter.[4]

## C. Credibility

In light of the Court's ruling above, summary judgment in favor of Mr. Michalski is warranted. Nevertheless, the Court still addresses credibility, not only because it provides an independent ground in support of summary judgment in Mr. Michalski's favor but also because, as discussed below, the Court is remanding the case and thus Mr. Michalski's credibility will need to be reassessed.

Under Ninth Circuit precedent,

> An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" In this analysis, the claimant is not required to show "that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." Nor must a claimant produce "objective medical evidence of the pain or fatigue itself, or the severity thereof."

---

[4] Given the Court's holding here, it need not address related arguments made by Mr. Michalski that appear to be of questionable merit (*e.g.*, that the ALJ failed to perform the "special technique" required for mental impairments and that the ALJ failed to make a materiality finding regarding alcoholism). *See also* AR 13 (ALJ decision) (addressing the degree of functional limitation arising from mental impairment as measured by activities of daily living, social functioning, concentration, and episodes of decompensation); AR 52 (ALJ hearing transcript) (ALJ seemingly accepting of medical expert's statement that the alcoholism was "currently non-material").

United States District Court
For the Northern District of California

> If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." This is not an easy requirement to meet: "The clear and convincing standard is the most demanding required in Social Security cases."

*Garrison v. Colvin*, 759 F.3d 995, 1014-15 (9th Cir. 2014).

In his decision, ALJ Scott found Mr. Michalski to be partially credible only, stating: "[T]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." AR 15. The ALJ did not, in his decision, explicitly identify why he reached that conclusion but it appears that the following affected his analysis:

- Dr. Cohen, the nonexamining physician, concluded that Mr. Michalski did not have bipolar disorder, and Mr. Michalski even thought that he did not have the disorder. *See* AR 16; *see also* AR 302.

- In May 2010 (prior to the alleged onset date of April 1, 2011), Dr. Eaton noted in a medical record that Mr. Michalski's mental status was "[e]ssentially at baseline. . . . No evidence of frank psychosis. No abnormal movements. No homicidal ideation." AR 259; *see also* AR 15.

- In June 2011, after a month-long stay at Sequoia Hospital following a manic episode, Mr. Michalski was discharged and assessed a GAF score of 65-70, "consistent with mild symptoms." AR 15; *see also* AR 240 (Discharge Summary) (noting Axis V score of 65-70).

- In March 2012, Mr. Michalski sent an e-mail to Dr. Eaton in which he stated that the new prescription for anxiety (Klonopin) "[w]orked great" and "[i]t does seem to make me feel better." AR 328.

- In February 2013, Dr. Eaton noted in a medical record that Mr. Michalski "states currently he feels 'ok.' No major complaints of depression or anxiety. Says that he failed to keep IOP [Intensive Outpatient Program] because he felt like he didn't need it and was able to function well without entering the program." AR 356; *see also* AR 15.

- Mr. Michalski's daily activities included washing his hair and shaving, preparation of

meals, traveling alone outside of his home, shopping, cleaning, e-mailing friends, and using Facebook. *See* AR 15-16.

- Mr. Michalski was not medication compliant and failed to follow treatment. *See* AR 16.
- Mr. Michalski stopped working in 2010, not because he was experiencing any disability issues but because he lost his job. *See* AR 16.
- Mr. Michalski applied for disability insurance benefits in April 2012 after being advised by Dr. Eaton to do so (in January 2012) because he "was 'having a difficult time finding a job.'" AR 16.
- Mr. Michalski was living off of his savings, which implicitly would not last indefinitely. *See* AR 16; *see also* AR 34 (ALJ hearing transcript) (Mr. Michalski testifying that he can live off of his savings for about three years before he runs out of money).

The Court finds the ALJ's credibility assessment problematic for several reasons. First, as indicated by the discussion above, Mr. Michalski did provide objective medical evidence (*e.g.*, Dr. Eaton's medical assessment[5]) that he suffered from bipolar disorder, and this could reasonably have caused some degree of his symptoms, including depression and social anxiety.

Second, the reasoning offered by ALJ Scott for rejecting Mr. Michalski's credibility is not clear and convincing. For instance:

- In May 2010, although Dr. Eaton stated in a medical record that Mr. Michalski's mental status was "[e]ssentially at baseline," AR 259, Mr. Michalski's condition was far from being positive. In the same medical record, Dr. Eaton took note that Mr. Michalski admitted to passive suicidal ideation, and Dr. Eaton further noted that he suspected bipolar disorder and that multiple medications had been tried with little improvement. *See* AR 259.
- While, upon his discharge from Sequoia Hospital in June 2011, Mr. Michalski was

---

[5] *See Smith v. Colvin*, No. 14-1413 EMC, 2015 U.S. Dist. LEXIS 52366, at *17 (N.D. Cal. Apr. 21, 2015) ("For a mental impairment, objective testing may include a mental status examination consisting of the physician talking to and observing the claimant . . . ."); *see also Reid v. Metro. Life Ins. Co.*, 944 F. Supp. 2d 1279, 1313 n.19 (N.D. Ga. 2013) ("'Bipolar disorder is diagnosed and treated based on the patient's self-reported symptoms. There are no x-rays, CT scans, MRIs, blood tests, or machines to measure or "objectively" prove bipolar disorder.'").

11

assessed a GAF score of 65-70, "consistent with mild symptoms," AR 15, that simply indicates that Mr. Michalski was no longer in a manic state. That does not detract from the fact that Mr. Michalski had just experienced a manic episode which required a month-long hospitalization. Furthermore, the DSM-V notes that "many individuals with bipolar disorder *return* to a fully functional level *between* episodes." DSM-V (emphasis added).

- In March 2012, Mr. Michalski did sent an e-mail to Dr. Eaton in which he stated that the new prescription for anxiety (Klonopin) "[w]orked great" and "[i]t does seem to make me feel better." AR 328. However, in the same e-mail, Mr. Michalski pointed out that Klonopin was having a "[s]ide effect problem: I've been doing impulsive/outgoing things unlike myself. In the back of my mind I question 'what in the hell am I doing?' without effective restraint. . . . Apparently [Klonopin] is causing 'disinhibition' – I'm acting almost like I've had 4 or 5 drinks." AR 328. Dr. Eaton responded with an instruction to stop the use of the drug: "Let me know if this disinhibition persists after stopping the Klonopin because it could also represent signs of mania." AR 328. Mr. Michalski ultimately did stop his use of Klonopin. *See* AR 330.

- In February 2013, Dr. Eaton did note in a medical record that Mr. Michalski "states currently he feels 'ok.' No major complaints of depression or anxiety. Says that he failed to keep IOP [Intensive Outpatient Program] because he felt like he didn't need it and was able to function well without entering the program." AR 356; *see also* AR 15. However, this does not take into account that, just a few months earlier, in December 2012, Mr. Michalski was hospitalized for three days. *See* AR 28. Moreover, just a few months later, in June 2013, Dr. Eaton expressed the opinion that Mr. Michalski had marked limitations in maintaining social functioning. *See* AR 368. Furthermore, the record contains some equivocation as to why Mr. Michalski did not attend the IOP; for instance, in July 2011, a medical record from Kaiser indicated that Mr. Michalski was discharged from the IOP "due to high deductible that [he] is unable to afford." AR 300. A similar financial restraint was mentioned in a medical record from August 2011. *See* AR 3014 ("Patient left IOP Early due to $95 co-pay.").

- According to the ALJ, Mr. Michalski's daily activities included washing his hair and shaving, preparation of meals, traveling alone outside of his home, shopping, cleaning, e-mailing friends, and using Facebook. *See* AR 15-16. But, as even the ALJ recognized, Mr. Michalski apparently still needed reminders from his wife to bathe. *See* AR 15. Furthermore, the ALJ's characterization of Mr. Michalski's daily activities is incomplete in significant respects. For instance, Mr. Michalski explained in a written report that he only washes his hair two times a week and shaves once a week "due to lack of motivation and energy." AR 201. In the same report, Mr. Michalski noted that he prepares only "simple meals such as sandwiches and microwave meals" that "take[] just a few minutes to prepare." AR 202. Mr. Michalski's wife, in a different report, also indicated that, at best, Mr. Michalski eats only pre-made items; otherwise, he waits for her to feed him. *See* AR 192. Regarding travel, both Mr. Michalski and his wife indicated that he goes outside just to see his therapist and buy cigarettes; his wife does the majority of the shopping. *See* AR 193, 202. With respect to household chores, Mr. Michalski noted that he does very little – *e.g.*, vacuuming once a week – and his wife reported that he cannot be depended on doing such chores. *See* AR 49, 192, 202. As for computer use and social interaction, Mr. Michalski simply stated that he e-mails "*a* friend about once or twice a week" and "I get on Facebook once every two months." AR 204. These daily activities hardly amount to the ability to do work, as even the Commissioner concedes in her brief. *See* Opp'n at 11-12. While the Commissioner contends that the daily activities are still inconsistent with the alleged level of impairment, the Court disagrees. For example, Mr. Michalski claims severe social anxiety but that is not inconsistent with e-mailing a friend occasionally and using Facebook occasionally, particularly where both activities are done on a limited basis and further can be done in solitude.
- According to the ALJ, Mr. Michalski was not medication compliant and failed to follow treatment. *See* AR 16. Mr. Michalski's failure to attend the IOP is discussed above. As for Mr. Michalski's failure to be medication compliant, it does appear, *e.g.*, that he stopped taking medications (in particular, Zyprexa) which precipitated the manic episode in late

13

May 2011. *See, e.g.*, AR 266, 282, 229. Nevertheless, Dr. Eaton's records repeatedly note that multiple medications as used by Mr. Michalski yielded little improvement. Moreover, that Mr. Michalski was given a new prescription for Lithium in March 2014 also indicates that previously used medications were of limited benefit. In other words, even when medically compliant, Mr. Michalski still experienced symptoms. Furthermore, the ALJ did not take into account that Mr. Michalski offered some reasons as to why he was not always medication compliant, *see* SSR 96-7p (noting that, for credibility purposes, there may be "good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner, *e.g.*, "[t]he individual may not take prescription medication because the side effects are less tolerable than the symptoms" or "[t]he individual may be unable to afford treatment") – *e.g.*, withdrawal from use of one drug (Adderall) made Mr. Michalski tired and depressed which then led him to forget to take his medication (Zyprexa), *see* AR 288; Mr. Michalski self-lowered his dose of Zyprexa because it increased his appetite and made his hands feel swollen, *see* AR 302; and Mr. Michalski stopped using Wellbutrin and Depakote because they interfered with his sleep and possibly made him more depressed. *See* AR 307.

- Although Mr. Michalski did stop working in 2010 because he lost his job, and not because he was suffering from any impairment, Mr. Michalski is not seeking disability as of 2010. Rather, the alleged onset date is April 1, 2011, which is shortly before the manic episode in late May 2011 that led to a month-long hospitalization.

- The ALJ claims that Mr. Michalski applied for disability insurance benefits in April 2012 after being advised by Dr. Eaton to do so (in January 2012) because he "was 'having a difficult time finding a job.'" AR 16. But, similar to above, the ALJ's characterization of the record is incomplete. The relevant medical record states: "[Mr. Michalski] had seen Dr[.] Eaton at the end of January and Dr[.] Eaton suggested that [he] apply for SDI since he is having such a hard time with his bipolar illness and finding a job." AR 325. The Court also takes note that, back in August 2011, *i.e.*, a few months after the manic episode, Dr. Eaton suggested social security as an option but Mr. Michalski stated that "he would

14

rather not do that." AR 314.

Further, it appears that Mr. Michalski's demeanor at the ALJ hearing, if anything, supported his credibility. *See* AR 45-56 (ALJ hearing) (ALJ stating that "you just keep dropping your voice down" and "one way that will help is if you don't look down at the table [while you speak]"). This conduct is consistent with Mr. Michalski's claim that he feels severe anxiety and that he usually looks at the floor because he feels uncomfortable. *See* AR 46.

For the foregoing reasons, the Court concludes that the ALJ erred at the first step of his credibility analysis and further erred by failing to provide clear and convincing reasons for rejecting Mr. Michalski's credibility. Because the ALJ's analysis of credibility is problematic, the Commissioner's reliance on *Carmickle v. Commissioner*, 533 F.3d 1155 (9th Cir. 2008), is unavailing. *See id.* at 1162 (indicating that, even if some of the reasons given by an ALJ in support of an adverse credibility finding was erroneous, that could be harmless error if the remaining reasoning in support was supported by substantial evidence in the record).

D.      Jobs That Could Be Performed Based on RFC

Finally, Mr. Michalski contends that the ALJ erred in assessing what jobs could be performed based on his RFC. For example, Mr. Michalski asserts that he could not perform the jobs of estimator, linen room attendant, or shipping and receiving clerk because such jobs, under the Dictionary of Occupational Titles, required a "Reasoning Level" of 3 or 4 which is greater than his RFC. *See, e.g.*, *Zavalin v. Colvin*, 778 F.3d 842, 847 (9th Cir. 2015) (stating that "there is an apparent conflict between the [RFC] to perform simple, repetitive tasks, and the demands of [a job with] Level 3 reasoning," which requires application of "commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and "[d]eal[ing] with problems involving several concrete variables in or from standardized situations"). Mr. Michalski further argues that he could not perform these jobs because of his nonexertional limitations – *e.g.*, being off-task for up to 5-10% of a day. *See* Mot. at 24 (arguing that, under the Dictionary of Occupational Titles, a shipping and receiving weigher is subject to an exacting level of performance and that a linen room attendant has little opportunity for diversion).

Because the Court is reversing and remanding based on the bipolar and credibility issues

15

discussed above, the Court need not address these final arguments, particularly because, on remand, the Commissioner may well need to reassess Mr. Michalski's RFC.

E.   Remand

Finally, the Court concludes that a remand for further proceedings is warranted, and not an immediate award of benefits. To the extent Mr. Michalski suggests that the Court can make the step three determination itself, *see* 20 C.F.R. Part 404, Subpt. P, App. 1 (§ 112.04, addressing mood disorders) (stating that the required level of severity for these disorders is met if, *e.g.*, the claimant has bipolar syndrome "with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes"), the Court does not agree. As noted in note 3, *supra*, a fuller record is needed for a proper step three (or even step four or five) analysis can be made. *See, e.g.*, *Treichler v. Comm'r of SSA*, 775 F.3d 1090, 1105 (9th Cir. 2014) (indicating that a remand to the agency is proper where, *e.g.*, not all essential factual issues have been resolved or the record is not fully developed).

### III.   CONCLUSION

For the foregoing reasons, the Court grants Mr. Michalski's motion for summary judgment, and denies the Commissioner's, but remands to the agency for further proceedings consistent with this opinion.

This order disposes of Docket Nos. 15 and 16.

**IT IS SO ORDERED**.

Dated: September 2, 2016

_____
EDWARD M. CHEN
United States District Judge